OPINION *Page 2 
{¶ 1} This matter is on appeal from appellant's conviction and sentence for the following charges: illegal manufacturing of drugs within the vicinity of a school, possession of drugs, trafficking in drugs within the vicinity of a school and possession of criminal tools. Appellee is the State of Ohio.
 STATEMENT OF FACTS AND CASE {¶ 2} The facts which are pertinent to this appeal are as follows:
 {¶ 3} On February 13, 2007, appellant was indicted by the Tuscarawas County Grand Jury for the following criminal charges: one count of illegal manufacture of drugs (crack cocaine) within a vicinity of a school in violation of R.C. 2925.04, a first degree felony, two counts of possession of drugs (cocaine) in violation of R.C. 2923.11, fourth degree felonies, six counts of trafficking in drugs (cocaine and crack cocaine) within a vicinity of a school in violation of R.C. 2925.03, fourth degree felonies, and one count of possession of criminal tools in violation of R.C. 2923.24, a fifth degree felony.
 {¶ 4} Prior to trial, on May 7, 2007, the state filed a "Motion in Limine on [the] Admissibility of Threats." In the motion, the state moved the court for permission to introduce, in its case in chief, "evidence of the Defendant's threats and other adverse conduct toward a state's witness, Samantha Scott, as relevant evidence of consciousness of guilt on the indicted charges."
 {¶ 5} On May 22, 2007, the matter proceeded to trial before a jury. Appellant was represented by attorney Gary Grieg from the Tuscarawas County Public Defender's Office. Prior to the presentation of evidence, the appellant moved the court for "different *Page 3 
counsel." Transcript of Proceedings Volume One at page 12, hereinafter TI . Appellant's request for substitute counsel was denied. TI. 13.
 {¶ 6} On May 25, 2007, after the presentation of evidence, appellant was found guilty as charged in the indictment and was sentenced to serve an aggregate six and one half (6½) year term of imprisonment. The judgment of conviction and sentence was memorialized on May 30, 2007.
 {¶ 7} It is from this judgment of conviction and sentence that appellant seeks to appeal setting forth the following assignments of error.
 {¶ 8} "I. THE TRIAL COURT ERRED WHEN IT OVERRULED APPELLANT'S MOTION FOR SUBSTITUTE COUNSEL.
 {¶ 9} "II. THE TRIAL COURT ABUSED ITS DISCRETION IN FAILING TO EXCLUDE EVIDENCE OF ALLEGED INTIMIDATION BY APPELLANT.
 {¶ 10} "III. THE TRIAL COURT ABUSED ITS DISCRETION IN ALLOWING A JURY INSTRUCTION ON CONSCIOUSNESS OF GUILT.
 {¶ 11} "VI. THE JURY VERDICT WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."
 I {¶ 12} In the first assignment of error the appellant argues that the trial court erred in failing to grant appellant's request for substitute counsel. In conjunction, appellant also argues that the trial court failed to make an adequate inquiry regarding the basis for the appellant's request for new counsel and failed to address how the appellant's concerns affected his relationship with counsel and the presentation of his defense. We disagree. *Page 4 
 {¶ 13} Substitution of counsel is within the discretion of the trial court. Wheat v. U.S. (1988), 486 U.S. 153, 108 S.Ct. 1692,100 L.Ed. 2d 140; State v. Jones, 91 Ohio St.3d 335, 343-44, 2001-Ohio-57,744 N.E.2d 1163. Thus, we review the trial court's decision under an abuse of discretion standard. State v. Murphy (2001), 91 Ohio St.3d 516, 523,2001-Ohio-112, 747 N.E.2d 765. An abuse of discretion is more than a mere error in judgment. It suggests that a decision is unreasonable, arbitrary or unconscionable. Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219, 450 N.E.2d 1140; State v. Adams (1980), 62 Ohio St.2d 151,157-158, 404 N.E.2d 144, 149.
 {¶ 14} An indigent criminal defendant has a Sixth Amendment right to competent counsel however, this constitutional right does not extend to a right to counsel of the defendant's choosing. Thurston v. Maxwell
(1965), 3 Ohio St.2d 92, 93, 209 N.E.2d 204. Likewise, the right to counsel does not include a right to a meaningful or peaceful relationship between counsel and the defendant. State v.Blankenship (1995), 102 Ohio App.3d 534, 558, 657 N.E.2d 559, citingMorris v. Slappy (1983), 461 U.S. 1, 13, 103 S.Ct. 1610, 75 L.Ed.2d 610. Where a defendant requests the appointment of new counsel, the trial court must inquire as to the basis for the request. Such inquiry need not be lengthy. The inquiry need only deal with specific issues raised by the defendant. State v. Johnson, 112 Ohio St.3d 210, 218,2006-Ohio-6404, 858 N.E.2d 1144.
 {¶ 15} To discharge a court-appointed attorney, the defendant must show a breakdown in the attorney-client relationship which warrants the substitution. State v. Coleman (1988), 37 Ohio St.3d 286, 292,525 N.E.2d 792. "A showing of good cause for substitution may include, a conflict of interest, a complete break-down in the attorney-client relationship or an irreconcilable conflict which leads to an apparently *Page 5 
unjust result." Blankenship, 102 Ohio App.3d at 558; see also State v.White, Marion App. No. 9-98-52, 1999-Ohio-847; State v. McCoy, Greene App. No. 2003-CA-27, 2004-Ohio-266. A simple "[d]isagreement between the attorney and client over trial tactics and strategy does not warrant a substitution of counsel. Moreover, mere hostility, tension and personal conflicts between attorney and client do not constitute a total breakdown in communication if those problems do not interfere with the preparation and presentation of a defense." State v. Furlow, Clark App. No. 03CA0058, 2004-Ohio-5279, at paragraph 12.
 {¶ 16} However, if a defendant makes the requisite showing for the substitution of counsel a trial court's failure to appoint new counsel amounts to the denial of the effective assistance of counsel. State v.Pruitt (1984), 18 Ohio App.3d 50, 57, 480 N.E.2d 499.
 {¶ 17} In the case sub judice, prior to the presentation of evidence, appellant requested new counsel. The trial court asked the appellant to set forth the basis for his request and the following colloquy occurred between the appellant and the court:
 {¶ 18} "Appellant: I would actually like to ask for different counsel.
 {¶ 19} "Court: Okay. Is there a reason why?
 {¶ 20} "Appellant: Mr. Greig was supposed to file a couple motions that he didn't file for me. And yesterday I felt threatened over the phone about the plea. And you know, I mean I'm not saying that he did it intentionally you know, I was forced — it was like I was being forced to take a plea. If not then I was gonna be penalized for not taking the plea. *Page 6 
 {¶ 21} "Court: No, course you know that's not the case because I'm telling you that's not the case.
 {¶ 22} "Appellant: Right.
 {¶ 23} "Court: The answer is I'm not going to substitute counsel for Mr. Greig. You've made the request, it's on this record and if in fact you're found guilty of any or all of these crimes and if you appeal there will be different counsel to represent you on appeal. I can promise you that. Because one of the things you are going to allege is my decision not to substitute another lawyer for Mr. Greig upon your request is error, is a mistake, that I should've done it, and I understand you believe that Carl, and the record reflects now that I'm overruling your motion to have another lawyer appointed to substitute for Mr. Greig. I am overruling because I believe Mr. Greig is going to capably and competently represent you at trial today. And I know you perhaps disagree. Any other comments Carl?
 {¶ 24} "Appellant: No that's all." TI. 13-14.
 {¶ 25} Upon review, we find that the trial court provided the appellant with ample opportunity to set forth his concerns regarding counsel's representation. During the inquiry the appellant did not describe a breakdown in the attorney client relationship. But rather, the colloquy indicated that the appellant and his counsel had a difference of opinion regarding motion filings and plea negotiations. However, the differences of opinion as to general trial tactics and/or appellant's general unhappiness do not support good cause for the substitution of counsel. In addition, the record does not reflect that the differences discussed affected trial counsel's ability to zealously represent the appellant and provide the appellant with a competent defense. For these reasons we do *Page 7 
not find that the trial court abused it's discretion in denying appellant's request for new counsel.
 {¶ 26} Accordingly, appellant's first assignment of error is not well taken and is hereby overruled.
 II {¶ 27} In the second assignment of error, appellant argues that the trial court abused its discretion in admitting other acts evidence. Specifically, appellant argues that the trial court abused its discretion in allowing appellant's girlfriend, Samantha Scott, to testify regarding alleged threats made to her by the appellant during the course of the police investigation. We disagree.
 {¶ 28} Evid. R. 404(B) states that "evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith." However, acts of misconduct are admissible if the conduct is relevant to an issue at trial and its probative value is not outweighed by its prejudicial effect.Cleveland v. Dillingham (May 11, 1995), Cuyahoga App. No. 67693, citingState v. Thompson (1981), 66 Ohio St.2d 496, 422 N.E.2d 855.
 {¶ 29} In balancing the probative value against the danger of unfair prejudice, the trial court is vested with broad discretion, and an appellate court should not interfere absent a clear abuse of discretion.State v. Harcourt (1988), 46 Ohio App.3d 52, 546 N.E.2d 214.
 {¶ 30} Under Ohio law, "evidence of threats or intimidation of witnesses reflect a consciousness of guilt and is admissible as admission by conduct." State v. Soke (1995), 105 Ohio App.3d 226, 250,663 N.E.2d 986; State v. Richey (1992), *Page 8 64 Ohio St.3d 353, 357, 595 N.E.2d 915. "Many acts of [a] defendant after the crime seeking to escape the toils of the law are uncritically received as admissions by conduct constituting circumstantial evidence of consciousness of guilt and hence of the fact of guilt itself." State v.Behun, Portage App. No. 1490, (Sept. 20, 1985), unreported, quotingMcCormick, Evidence (2d Ed.Cleary Ed. 1972) 655, Section 271.
 {¶ 31} In State v. Exum, Franklin App. No. 05AP-894, 2007-Ohio-2648, the trial court held that appellant's comments to a co-defendant telling him that he was the only missing link to connect him to the crime, to keep his mouth shut, and yelling "You snitching bitch" were admissible as being related to consciousness of guilt.
 {¶ 32} In State v. Soke, the court held that appellant's statements that "whoever testified against him had better hope he's six feet under" and that if Randy Bassinger testified against him "when he got out he was going to cut his throat" were admissible to "reflect a consciousness of his guilt, similar to evidence of flight to avoid prosecution, or efforts made to cover up a crime or intimidate witnesses." See also,State v. Eaton (1969), 19 Ohio St.2d 145, 249 N.E.2d 897
 {¶ 33} In the case sub judice, on the second day of trial, prior to the testimony of the state's witness, Samantha Scott, the trial court took the state's motion in limine into consideration. (Transcript of Proceedings, Volume Two at page 240, hereinafter TII.___). The state argued that the motion in limine pertained to threats made by the appellant to Samantha Scott. TII. 240. The state informed the court that during the investigation, Ms. Scott had provided the police with a written statement, in which Ms. Scott stated that the appellant had been "selling regularly" out of their apartment. TII.241. The appellant had learned about Ms. Scott's cooperation with the police *Page 9 
investigation and had told her not to write any more statements and not to cooperate with the police. TII. 241.
 {¶ 34} Specifically, Ms. Scott gave the police a written account of the appellant's threats stating that, after the appellant was released pending trial, he told her "to get the rest of her belongings [out of the apartment] * * * got mad at me and punched me in the eye and punched me in the lip. He was — he has been calling me giving me harassing phone calls telling me if I were to say anything he is going to do it again." TII. 241 and 247. Ms. Scott stated that appellant meant "anything" to mean "write or say anything." TII. 241 and 247. The state argued that Ms. Scott was "afraid", "concerned" and "felt intimidated" and that the evidence was admissible as being relevant evidence of appellant's guilty intent. The state argued that "[t]he only person who threatened somebody would be the person cooking up the crack cocaine to keep the other person quiet. So that goes strictly to identity of the person actually cooking the crack cocaine up." TII. 242. "It's direct evidence generated by the Defendant indicating consciousness of guilt". TII. 244.
 {¶ 35} The trial court voir dired Samantha Scott outside the presence of the jury. TII.461. During the voir dire Samantha Scott testified that she had known the appellant for approximately two years. TII. 462. She testified that after the appellant was released from jail, she was riding in a car with the appellant and he told her he was upset that she had given a written statement to the police and then hit her in the eye. TII. 465, 469-470. She stated that she still had a red eye when she talked to investigating officer, Agent Hitchcock. TII. 473. She stated that she provided the investigator with a written statement in which she stated as follows: "It was approximately five weeks I went to the *Page 10 
apartment in Dover to get the rest of my belongings with Carl and he got mad at me and punched me in the eye and busted me in the lip. He has been calling me and giving me harassing phone calls telling me if I write or say anything he's going to do it again. The person I'm talking about is Carl Conner." TII. 475, 479. She testified that it took about a week for her eye and lip to clear up. TII. 479. She testified that at the time she was afraid because he was telling her not to say anything and "stuff like that, but honestly I don't think he would ever harm me or anything like that cause that's not Carl." TII. 482. She stated that she wasn't concerned about further contacts with the appellant. TII. 476.
 {¶ 36} After the voir dire of Samantha Scott, the trial court granted the State's motion to introduce appellant's threatening statements and permitted Samantha Scott to testify regarding the alleged intimidating statements and actions of the appellant. TII. 506. The trial court reasoned that the State had the right to question the witness about this relevant evidence and the jury had the right to decide, based upon her direct testimony and cross examination, whether the witness was threatened by the appellant and/or whether the witness' testimony established that the appellant made the statements knowing he was guilty of the underlying indictment i.e. consciousness of guilt. TII. 491-492. The trial court further stated, "I think it is clearly an argument the prosecutor has a right to make." TII. 492.
 {¶ 37} At trial, Samantha Scott was asked to read her written statement to the jury. TIII. 532. On cross-examination, she testified that she had known the appellant for two years. TIII. 533. She stated that she did not consider him to be a violent person. She also testified that she didn't believe that he meant to threaten her. Specifically, she *Page 11 
stated, "I mean sounds maybe a little silly cause he done it but [I] honestly don't think that he meant it." TIII. 536. When she was asked whether she wrote the statement believing that the appellant was trying to influence her in this case, she replied, that the statement was over an argument about her cell phone, "he wanted to see my cell phone." TIII. 538-539. She said, "He wanted to look at it and I wouldn't let him." TIII.539. She further said that they both began struggling over the cell phone and she accidentally got hit in the eye. TIII. 539. She concluded by saying, "I never really felt threatened." TIII. 540.
 {¶ 38} Upon review, we find that the trial court did not abuse its discretion in permitting the introduction of appellant's threatening behavior and comments. The evidence of appellant's statements and actions toward Samantha Scott was relevant as to appellant's guilty conscience regarding the indicted charges. The jury heard Samantha Scott's statements made at the time of the threats and Samantha Scott's interpretation of the incident through her testimony at trial that she did not believe the appellant would hurt her. The jury was free to believe or disbelieve any of her testimony. Accordingly, appellant's second assignment of error is not well taken and is hereby overruled.
 III {¶ 39} In the third assignment of error, the appellant argues that the trial court abused its discretion and committed prejudicial error by giving a jury instruction on consciousness of guilt. We disagree.
 {¶ 40} The law requires that jury instructions must fairly and correctly state the law applicable to the evidence presented at trial.Wozniak v. Wozniak (1993), *Page 12 90 Ohio App.3d 400, 410, 629 N.E.2d 500; see, also, Kokitka v. Ford MotorCo. (1995), 73 Ohio St.3d 89, 93, 1995-Ohio-84, 652 N.E.2d 671. If taken in their entirety, the instructions fairly and correctly state the law applicable to the evidence presented at trial, reversible error will not be found merely on the possibility that the jury may have been misled.Wozniak v. Wozniak, supra. Rather, this Court must determine whether the jury charge in its entirety resulted in prejudice. State v. Jackson
(2001), 92 Ohio St.3d 436, 446, 2001-Ohio-1266, 751 N.E.2d 946;State v. Porter (1968), 14 Ohio St.2d 10, 13, 235 N.E.2d 520.
 {¶ 41} In this case, Samantha Scott testified that the appellant told her not to cooperate with the law enforcement investigation and threatened to cause her further physical harm if she provided the investigator with any additional information. On cross-examination, Samantha Scott testified that she did not believe that the appellant meant to threaten her, that the argument was over a cell phone and that the physical harm occurred when she and the appellant struggled over her cell phone and she accidentally got hit in the eye. She concluded by saying, "I never really felt threatened."
 {¶ 42} At the conclusion of the evidence, the trial court instructed the jurors that they were the sole judges "of the facts and circumstances, of the credibility of the witnesses who testified," of the "weight or value to be given to the testimony of each witness, and the deductions and conclusions that logically follow from the facts and circumstances which were established by the evidence." TIII. 597.
 {¶ 43} The court further instructed the jury that in order to determine the weight and value of the evidence, they must consider the credibility of the witnesses. The trial court instructed the jurors as follows: *Page 13 
 {¶ 44} "You will use those tests to determine whether someone is telling you the truth or not that we use in our daily lives, and they include as I indicated earlier in the trial at the initial instruction time, those tests include the appearance of each witness on the witness chair, his or her manner of testifying, the reasonableness of the witness testimony, the opportunity the witness had to see, hear and know the things concerning which he or she is testifying, the intelligence of the witness should be taken into account and the interest or lack of it and any bias that the witness might have should be taken into account in judging credibility as well, and then all the facts and circumstances surrounding the testimony are to be folded into your decisions about credibility and assigning weight and value.
 {¶ 45} "In applying these tests to determine credibility and assign weight and value and any other tests that you believe are appropriate in your own personal decision making process you are assign[ing] to the testimony of any witness. It is your duty in this trial however to determine what testimony is worthy of belief and what testimony is not worthy of belief.
 {¶ 46} "Ladies and gentlemen, you are not required to believe the testimony of any witness simply because she or he was under oath or an affirmation. You may believe or disbelieve all or part of the testimony of any witness. It is your duty in this trial however to determine what testimony is worthy of belief and what testimony is not worthy of belief." TIII. 598-599.
 {¶ 47} The trial court also gave the following instruction on consciousness of guilt to the jury: *Page 14 
 {¶ 48} "The State of Ohio alleges that Mr. Conner attempted to influence Samantha Scott, a witness in connection with the crimes charged against Mr. Conner in this case. You may consider this evidence in light of and in harmony with all the other evidence in the case. You may consider whether this evidence shows a consciousness of guilt and determine the significance to be attached to any such conduct proved by the State of Ohio beyond a reasonable doubt." TIII. 616.
 {¶ 49} The language of the instruction permitted the jury to consider consciousness of guilt based on their evaluation of the credibility of the evidence presented and the witness's testimony. The instruction did not demand that the jury consider the evidence presented as consciousness of guilt. The jury was instructed that they were free to disregard any testimony that they did not find to be credible. Furthermore, although the testimony of Samantha Scott was inconsistent, it supported the trial court's decision to instruct on the consciousness of guilt.
 {¶ 50} For these reasons, we do not find that the instruction on consciousness of guilt, in conjunction with the instruction as a whole, was prejudicial. Accordingly, we find that the trial court did not abuse its discretion in instructing the jury on consciousness of guilt. For these reasons appellant's third assignment of error is not well taken and is hereby overruled.
 IV {¶ 51} In the fourth assignment of error, appellant argues that his conviction is against the weight and sufficiency of the evidence.
 {¶ 52} In State v. Jenks (1981), 61 Ohio St.3d 259, 574 N.E.2d 492, the Ohio Supreme Court set forth the standard of review when a claim of insufficiency of the *Page 15 
evidence is made. The Ohio Supreme Court held: "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."Id. at paragraph two of the syllabus.
 {¶ 53} On review for manifest weight, a reviewing court is to examine the entire record, weigh the evidence and all reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed. The discretionary power to grant a new hearing should be exercised only in the exceptional case in which the evidence weighs heavily against the judgment." State v. Thompkins, 78 Ohio St.3d 380,387, 1997-Ohio-52, 678 N.E.2d 541, citing State v. Martin (1983),20 Ohio App.3d 172, 175, 485 N.E.2d 717. Because the trier of fact is in a better position to observe the witnesses' demeanor and weigh their credibility, the weight of the evidence and the credibility of the witnesses are primarily for the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, 227 N.E.2d 212, syllabus at paragraph one.
 {¶ 54} In this case, appellant was charged with the illegal manufacture of drugs, possession of drugs, possession of criminal tools and trafficking in drugs. In this assignment, appellant argues that the state failed to prove beyond a reasonable doubt *Page 16 
that the appellant "manufactured any narcotics" or "possessed any criminal tools." (Appellant's brief page 18).
 {¶ 55} The elements of the offense for the illegal manufacture of drugs are as follows: "No one shall knowingly cultivate marihuana or knowingly manufacture or otherwise engage in any part of the production of a controlled substance" 2925.04(A). If the drug involved in the violation is any compound mixture, preparation, or substance included in schedule I or II[1], with the exception of marijuana, and if the offense was committed in the vicinity of a school, illegal manufacture of drugs is a felony of the first degree. R.C. 2925.04(C)(2).
 {¶ 56} An offense is committed in the vicinity of a school if the offender commits the offense on school premises, in a school building, or within one thousand feet of the boundaries of any school premises, regardless of whether the offender knows the offense is being committed on school premises, in a school building, or within one thousand feet of the boundaries of any school premises. R.C. 2925.01 (P).
 {¶ 57} The elements of possession of drugs are as follows: "No person shall knowingly obtain, possess, or use a controlled substance." R.C. 2925.11(A). If the drug involved in the violation is cocaine or a compound mixture, preparation, or substance containing cocaine, and the amount of the drug involved equals or exceeds five grams but is less than twenty-five grams that is not crack cocaine or equals or exceeds one gram but is less than five grams of crack cocaine, possession of cocaine is a felony of the fourth degree. R.C. 2925.11(C)(4)(b).
 {¶ 58} The elements of trafficking in drugs as set forth in R.C. 2925.03(A)(1) are as follows: "(A) No person shall knowingly do any of the following: (1) Sell or offer to sell *Page 17 
a controlled substance." R.C. 2925.03(A)(1). If the drug involved in the violation is cocaine or a compound mixture, preparation, or substance containing cocaine, the perpetrator is guilty of trafficking in cocaine. R.C. 2925.03(A)(4). If the offense was committed in the vicinity of a school trafficking in cocaine is a felony of the fourth degree. 2925.03(4)(b).
 {¶ 59} The elements of possession of criminal tools as set forth in R.C. 2923.24 are as follows: "(A) No person shall possess or have under the person's control any substance, device, instrument, or article, with purpose to use it criminally."
 {¶ 60} Pertinent to this case, each of the following constitutes prima-facie evidence of criminal purpose: "(2) Possession or control of any substance, device, instrument, or article designed or specially adapted for criminal use; (3) Possession or control of any substance, device, instrument, or article commonly used for criminal purposes, under circumstances indicating the item is intended for criminal use."[2]
 {¶ 61} "Possession means having control over a thing or substance." R.C. 2925.01(K). Possession may not be inferred solely from mere access to the thing or substance, or occupation of the premises upon which the thing or substance was found. Id. Possession may be actual or constructive. State v. McShan, 77 Ohio App.3d 781,783, 603 N.E.2d 1076. Constructive possession is demonstrated if the contraband is in a defendant's dominion or control. State v. McShan (1991),77 Ohio App.3d at 783, 603 N.E.2d 1076; State v. Wolery (1976), 46 Ohio St.2d 316, 332,348 N.E.2d 351. "A person may constructively possess a substance or object if he `knowingly exercise[s] dominion and control over an object, even though that object may not be within his *Page 18 
immediate physical possession[;] or [if he has] knowledge of the presence of the object.'" State v. Woodson, Wayne App. No. 07 CA 0044,2008-Ohio-1469 at paragraph 20, citing State v. Hilton, Summit App. No 21624 at paragraph 16 quoting State v. Hankerson (1982),70 Ohio St.2d 87, 434 N.E.2d 1362, at paragraph one of the syllabus, certiorari denied, 459 U.S. 870, 103 S.Ct. 155, 74 L.Ed.2d 130.
 {¶ 62} The State may prove dominion and control through circumstantial evidence. See State v. Jenks, 61 Ohio St.3d 259, 272, 574 N.E.2d 492.
 {¶ 63} It is well-settled that "[d]irect evidence, circumstantial evidence, or both may establish an element of the charged offense."State v. Durr (1991), 58 Ohio St.3d 86, 92, 568 N.E.2d 674. Moreover, circumstantial and direct evidence are considered to be of equal probative value. State v. Jenks supra at paragraph one of the syllabus.
 {¶ 64} In this case both the direct and circumstantial evidence could lead the jury to believe beyond a reasonable doubt that the appellant was guilty of the charged offenses, i.e. that the appellant manufactured illegal substances and possessed criminal tools.
 {¶ 65} During the trial, the State presented the testimony of several witnesses including Kimberly Haney, DEA agent Nichole Parsons, Aaron Tice (an undercover operative), Sam Hitchcock (a DEA agent), Paul Bantum (a Captain with the Dover Police Department), Ronald Broadwater from the Ohio Bureau of Criminal Investigation, Narcotics Division, and Samantha Scott, appellant's live-in girlfriend.
 {¶ 66} Kimberly Haney testified that she met the appellant through a friend and had only known the appellant for approximately a month. TI.139. She testified that after she left the appellant's residence, she was stopped in New Philadelphia, Ohio for a *Page 19 
traffic violation (fictitious plates). TI.159. During a consent search, the officers found a crack pipe in her vehicle. TI.141-142. The police asked her if she would be willing to help with their drug investigation involving the appellant, and she agreed. TI.143. That evening she met DEA investigator, agent Sam Hitchcock. TI.143. Agent Hitchcock asked her to make a controlled drug buy from the appellant. TI.143.
 {¶ 67} Haney testified that on January 18, 2007, in Hitchcock's presence, she made a recorded telephone call to the appellant to arrange the drug buy. TI.144-146. Appellant answered the phone and agreed to make the sale. TI.145. After the arrangements were made, she was searched for drugs and weapons by the DEA agent. She then drove to the appellant's residence and parked in the parking lot. TI.147. The appellant got into her vehicle and gave Haney the crack in exchange for sixty ($60.00) dollars. TI.147. She testified that she immediately met Hitchcock at the Dover library and gave him the crack cocaine which she had purchased from the appellant. TI.147-149.
 {¶ 68} Haney testified that on January 25, 2007, she made a similar controlled drug buy under the supervision of agent Hitchcock. This time she testified that she purchased one hundred ($100.00) dollars of cocaine from the appellant. She testified that during a recorded telephone conversation, the appellant told her to come into his Dover residence, slide the money for the drugs under his bathroom door and then he would slide the cocaine back underneath the door to her.TI.150. After the telephone call, Haney was searched for drugs and weapons, then she and DEA agent, Nichole Parsons, drove to the appellant's residence. The only other person at the residence was the appellant's girlfriend's mother, Vickie, who answered the door. TI.151. Haney *Page 20 
testified that she made the transaction for the drugs under the appellant's bathroom door, went straight back to the car and gave the crack cocaine to the DEA agent. TI.153. She testified that she knew appellant's girlfriend Samantha Scott and that appellant, not Samantha, "ran the house." TI.171.
 {¶ 69} Nichole Parsons testified that she works with DEA agent Samuel Hitchcock doing undercover work for S.E.N.T. operations.[3] TI.175. She testified that she worked with Kimberly Haney to execute a second controlled drug buy with the appellant. She authenticated a recorded conversation between Haney and the appellant during which the appellant stated, "I'm gonna get in the shower. Why don't you let me call you back in 15, 20 minutes." TI.179.She testified that she was present when Haney made a second telephone call while they were sitting in appellant's driveway to confirm the arrangements for the drug buy. TI. 181. During the second recorded conversation the appellant stated that he was out of the shower and "slide it [the money] under the door". TI.182. She stated that when Haney came out of the residence, Haney handed her the crack cocaine. TI.182.
 {¶ 70} Aaron Tice testified that he was an undercover operative brought into the case to buy drugs from the appellant. TI.197. He stated that on January 31, 2007, Agent Hitchcock "hooked me up" with a local informant, Hugh Dampier. TI.200. Dampier used Tice's cell phone to call the appellant and set up the drug buy.TI.201. Dampier set up a buy for a "ball" for $200.00 i.e. an eight ball of cocaine which is approximately two to three grams with a value of $150.00 to $250.00.TI.202. During the call, Dampier asked appellant to take "50" off the price because they only had $150.00 *Page 21 
to spend. TI.205. Tice testified that he and Dampier drove to appellant's residence and pulled into a parking lot parallel to theapartment.TI.205. He stated that the appellant came down out of the apartment and walked up to the passenger side of the vehicle. TI.205. Tice testified that the transaction did not go smoothly because the price of the ball was $200.00 and they only had $150.00 to spend. TI. 206. He stated that eventually, the appellant dropped a rock in Dampier's hand and said, "Fuck it, it's on me", turned around and walked away. TI. 206-207. Tice and Dampier then delivered the cocaine to agent Hitchcock. TI. 207.
 {¶ 71} Tice testified that on February 1, 2007, the appellant kept calling his cell phone. TI. 209. Agent Hitchcock instructed Tice to try and set up another buy for that evening. TI. 209. As a result Tice called the appellant to set up a second buy for a $200.00 rock. TI. 209. At approximately 7:24 P.M. Tice made a second recorded telephone call to the appellant from agent Hitchcock's car. TI. 211-212. During the second call appellant said, "what'd you want", Tice responded "two hundred worth of snow man". TI. 211. Tice then drove to the appellant's residence and made a third call when he got to the parking lot. TI. 212. The appellant came down to the vehicle and Tice rolled down the driver's side window. TI. 212. The appellant asked Tice if he was a "cop" and asked where Tice worked. TI. 213. Appellant asked "you got a pay stub?" Tice responded that he didn't carry one. Appellant then gave Tice the drugs and said "Okay, see you later." TI.213. As Tice left, another car followed him for a few blocks. TI. 213. Tice called agent Hitchcock to let him know he was being followed and made different arrangements to drop off the drugs. TI. 214. *Page 22 
 {¶ 72} Tice testified that on Superbowl Sunday, February 4, 2007, under agent Hitchcock's supervision, Tice made a tape recorded telephone call to the appellant and asked the appellant if he was going to watch the game and if he had made up $200.00 worth of "snow". TI. 215. The appellant asked him if he preferred "soft" and told him to meet him in the parking lot. TI. 216. Tice testified that he drove to the appellant's apartment building and pulled into the parking lot. TI. 217. The appellant came down and got into the vehicle. Tice showed him his pay stub for his job at Belden Brick. The appellant warned Tice that he carried a gun at all times and then dropped the drugs into Tice's car door handle. TI. 218.
 {¶ 73} Tice testified that on February 6, 2007, he set up a final drug buy under the supervision of the DEA. TI. 221. He stated that this buy was different because it was going to end in appellant's arrest. TI. 222. In a tape recorded conversation Tice said to appellant, "I'm in the area, wondered if I could come by and pick up a couple bill's worth" (i.e. $200.00 worth). TI. 222. In a second tape recorded call Tice again said he wanted a "couple bucks worth" and appellant said "soft right? * * * call me and I'll bring it down." TI. 224. Tice testified that when he arrived at appellant's apartment building, the appellant came down to the driver's side door of the vehicle, stuck his head in the window, collected the money and dropped the cocaine in the door handle (i.e. a "crack throw down"). TI. 224 and 235. Tice stated that appellant asked him again if he was a "cop" and said, "well you know, I'm a crazy mother fucker * * * I just don't trust you and all." TI. 225. Tice said he immediately alerted agent Hitchcock that he had the drugs and that appellant had the money. TI. 226. The police then responded to make the arrest. TI. 226. *Page 23 
 {¶ 74} Sam Hitchcock, a DEA agent, testified that he became involved in an investigation of the appellant's drug activities on or about January 6, 2007. TII. 271-272. He testified that the appellant resided in an apartment complex which is approximately a block away from both Dover High School and Saint Joseph Elementary School. TII. 280. He testified that on February 5, 2007, he obtained a search warrant for the appellant's residence. TII. 307. On February 6, 2007, his agency and the Dover police department participated in the "buy bust" of appellant.[4] TII. 308. He testified that he listened to the transaction between Aaron Tice and the appellant and heard the conversation about the gun. TII. 309. He stated that "with his making a statement that he always carried a gun and with other information that led us to believe that Conner may be armed or may have further weapons in the apartment we didn't want to let him get back in the apartment." TII.309. After Aaron Tice gave Hitchcock the "audible" he gave the Dover police units the code phrase to arrest the appellant. TII. 311. During a pat down search, the officers found appellant to be in possession of a couple packages of powder cocaine (i.e. 7 grams of cocaine from appellant's left front pocket and 9.2 grams of cocaine in appellant's front pants pocket with a street value of $1,500.00), $110.00 in United States Currency and the $200.00 in buy money. TII. 317-320.
 {¶ 75} After the arrest, Hitchcock testified that he participated in the execution of the search warrant of appellant's apartment. TII. 316. He testified that an entry team from the New Philadelphia Police Department secured appellant's apartment and took Samantha Scott into custody pursuant to an arrest warrant out of the Southern District *Page 24 
Court. TII. 361 and 365. He stated that, at the time, Samantha Scott appeared to be under the influence of drugs and would not have been physically able to "cook up" or "follow recipes for making crack cocaine." TII. 373-374. Hitchcock and the other officers testified that, upon entering, they observed a television that received video from a security camera near the front door of the entrance, the kitchen countertop directly above the stove covered in a white residue, a clear glass with white residue, a microwave with the door open, an open box of baking powder, a crack pipe, portable digital scales, a ceramic spoon with white residue, a pocket knife with white residue, four pieces of cocaine pre-packaged for sale as a "twenty rock" or a "twenty piece", a muzzle loader, shotgun shells, and .223 caliber ammunition for an assault rifle. TII. 339, 363, 385-395.
 {¶ 76} Hitchcock testified that during an interview, the appellant admitted that he has been a drug addict for six years and stated, "I'm not in it for the money, I'm in it for the drugs." TII. 328 and 334. Appellant stated, "I don't have anything to sell, I really don't" TII. 329. The appellant also asked the agent why he was being charged with a first degree felony. Hitchcock explained it was because he was cooking crack in a school zone, to which the appellant responded, that he didn't realize he was in a school zone." TIII. 585 and 589.
 {¶ 77} Paul Bantum, a Captain with the Dover Police Department, testified that the appellant's apartment, which is located at 425 Broad Street in Dover, Ohio, is 280 feet from the Saint Joe's Elementary School playground and that appellant's apartment was within a thousand feet of Dover High School. TII. 377-378, 422. *Page 25 
 {¶ 78} Ronald Broadwater from the Ohio Bureau of Criminal Investigation, Narcotics Division, testified that powder cocaine is often "made to go a little further" by adding a cutting agent. TII. 433. He testified that crack cocaine is made when powder cocaine plus water and baking soda is brought to a boil on either a stove or in a microwave. TII. 436. He stated that once it boils, you remove it from the water, it hardens up, is cut into pieces the size of a pencil eraser and the pieces are sold. TII. 434-437. He testified that it takes between 15 and 20 minute to manufacture crack cocaine. TII. 441 and 454. He stated that normally a small dose is packaged as "tear offs" where you tear off a piece of cellophane, wrap it up or tie it up making it or it can be placed in a baggy, thereby making it easy to transport. TII. 437. He stated that a low level dealer will sometimes hand it over without any packaging. TII. 437. He further testified that if you are addicted to crack cocaine and you are using your "own stuff" you will do anything to keep it coming including buying and manufacturing to provide income to support the habit. TII. 451. He testified that you can use powder cocaine and either cut it or turn it into crack to make a bigger profit. TII. 451. As a result he stated that there is financial incentive for an addict to buy the powder, manufacture a little bit and make it more valuable, i.e. sell it and make a bigger profit. TII. 451-452. He also stated that if a person is selling cocaine "they will have powder cocaine and crack cocaine because they'll have different buyers." TII. 455.
 {¶ 79} Samantha Scott, appellant's girlfriend, testified that she and the appellant moved into the Dover apartment about a month and a half before the drug raid. TIII. 554. She testified that, prior to the drug raid, she had smoked crack cocaine. TIII. 577. She testified that, at the time of the raid, she and the appellant had been in the *Page 26 
apartment, and appellant left for a couple minutes. TIII. 562. She stated that the appellant was selling cocaine out of the apartment several times a day. TIII. 555. She testified that the appellant used several items seized from the apartment to cook cocaine. TIII. 556-557. Specifically, when she was asked if Carl did the cooking she responded "I didn't." TIII. 557.
 {¶ 80} In this case, based on the evidence presented the jury could reasonably conclude that appellant was guilty of the charged offenses including the manufacturing of narcotics in the vicinity of a school and the possession of criminal tools. Accordingly, the verdict was not against the sufficiency or manifest weight of the evidence. The appellant's fourth assignment of error is not well taken and is hereby overruled.
 {¶ 81} The judgment of the Tuscarawas County Court of Common Pleas is hereby affirmed.
Edwards, J. Hoffman, P.J., and Gwin, J., concur.
 JUDGMENT ENTRY
For the reasons stated in our accompanying Memorandum-Opinion on file, the judgment of the Tuscarawas County Court of Common Pleas is affirmed. Costs assessed to appellant.
[1] Cocaine is a schedule II controlled substance.
[2] In the indictment the criminal tools listed as being in the appellant's possession included a microwave oven, digital scales, baking soda, glass containers and other related items used for the manufacturing of crack cocaine.
[3] "S.E.N.T. was a multi county regional task force, [whose] primary responsibilities had been * * * drug investigations * * * in 2002 * * * it was expanded to [include] weapons, trafficking, gang activity and organized crime." TII.270.
[4] "A buy bust is where after we make the purchase we immediately arrest the suspect, take the copied or identifiable buy money off the subject. And many times we do following a raid on the location if the drugs had been coming out of there and there's an indication that there's a good possibility that there will be drugs at the location and that is what was done in this case with the aid of a search warrant." TII.307. (Testimony of Samuel Hitchcock.) *Page 1